141027 Kalitta Air LLC v. GSBD & Associates LLC et al. Arguments not to exceed 15 minutes for appellant. Ms. Jackson for appellant. Angela Jackson appearing on behalf of Kalitta Air. Good afternoon. As I'm sure all of you are already aware, this is a case pled under RICO where nine defendants joined together to form an enterprise where they would, among other things, attempt to sell jet fuel to air carriers like my client Kalitta Air, representing that they were backed by a phony bank, the Atlantic Bank. Which, as it turns out, was never authorized to operate in Michigan or the United States. But the financial part of the defendants in this case held themselves out to be affiliates of that bank. And they held themselves out to my clients to have a $500 million line of credit for the support of petroleum products sales. So that my clients would, and others like them, would rely on the representations and enter into a deal with them for the purchase of jet fuel. Go ahead. No, I insist. Oh, okay. A couple questions on the continuity aspects of the case. One of the concerns that the district court judge obviously had is that once the defendants had extracted from your client all the money they were going to extract, it was over. It was done. It had achieved its closed end. What's your best case, two questions. First, what's your best case to support your argument, which the district court did adopt on reconsideration, that the relevant period was the 32-month period instead of ending when the money was gone from the account and after that it was basically sort of lulling messages. But only three of them and no further efforts to get additional money, the escrow account had been emptied as of, I guess, May of 2010. Right, May of 2010. Well, I think, you know, our obligation is to show that there was a period of time that the predicate X stretched over some period of time and the threat of continuing activity into the future on the closed period issue. And there are two things about the 32 months. First, I'd like to say that the defendants don't get the benefit of the fact that they emptied the account of my client's money. And I think the Waiting Angels case is a good example, a good explanation of why the criminals don't get the benefit of getting caught, which is essentially what happened here. My client terminated the escrow agreement because they realized that, or they thought, that money was being taken from this account and they couldn't reconcile the amount of jet fuel they were getting with the amount of money that they were paying. Something was going wrong and they weren't getting explanations for it. So when they terminate the escrow agreement and thereafter, within the next couple of months, the escrow account finally gets depleted, the defendants don't get the benefit of that end period in May of 2010 simply because they were caught. It was the fortuitous catching of the criminals that caused the built-in endpoint, if you were, as it were, that Judge Friedman relied on. So that's the first point that I want to make. With respect to the 32 months, the projecting out past the date of the account being drained, if you look at what the defendants were doing in that period, I think that is the perfect evidence that satisfies the threat of the ongoing criminal activity portion of that prong of the test. Even if there's no other victim that's considered, that would be enough? Well, we do have other victims. But setting that aside, yes, I think so. We do have other victims. Setting it aside, I think so. And I think so because these communications between the defendant, and remember, Garth Gottschalk, who is sending communications to my client, trying to describe the deals that are underway that will allow them to reconcile the account and they can continue going on business as usual. Garth Gottschalk, and you can see this in Exhibit 2 of the First Amended Complaint, is not only a managing member of GSB, the enterprise, the entity that was set up for the purpose of conducting these transactions, but he also holds himself out to be the vice president of the bank, First International Exchange Corp. And Exhibit 2 shows his signature as vice president of First International Exchange Corp, the bank with the $500 million line of jet fuel credit from the bank that doesn't exist in the state of Michigan, that's eventually enjoined from operating in the state of Michigan by the Attorney General's office, is also holding himself out and is the managing member of GSB. So he is working both sides of the scheme, and he is communicating with my client in both of those capacities, as the bank and as the jet fuel provider, by saying, we're financially stable, we can handle this, all you have to do is give us a little bit more time and we'll be able to reconcile things, we'll go on business as usual. So the last communication we include in our amended complaint is in 2011. And so that takes us to a 32-month period if you're looking at a rigid time-based requirement. But one of the things that I think, a mistake where the lower court made, and I think I've seen in a lot of opinions, is that a rigid look at a period of time in months isn't really what the Supreme Court had in mind. Are we talking open or closed right now? We're talking closed right now. So our allegations in the complaint cover a 32-month period. Would you talk about opinions that you do not admire in this area? Moon, right. Moon. And I think that if you go back and look at what the Supreme Court says in the H.J. case, the Supreme Court is recommending and holds that a much more flexible approach needs to be taken when you're looking at the continuity requirement. I have an open-ended continuity question, but I'm going to let Judge Ketledge ask it, unless your question has been answered. I have one quick factual question and then an open-ended as well. Go for it. Factual is, how many payments, again, did your client make into the escrow account? Oh, that's a... Was it more than one? Oh, yes, many more than one. And they only stopped, as you point out, because they sensed that something was awry. Yeah, it's apparently very hard in the delivery of jet fuel because prices fluctuate every day and weights fluctuate from one point to another. So it's very hard to reconcile, which makes it easy for scammers. So there were lots of payments. But there were lots of payments. I have it in the amended complaint. I want to say 10 or 19. Okay, and that's alleged in the complaint? Yes. Okay, that's very helpful. And then for the open-ended conspiracy, I guess the test is whether the predicate acts pose a threat of continuing criminal conduct extending beyond the period in which they were performed. My question is, at what point in time do we measure whether a threat would have existed? Do we measure it when those initial acts happen, or do we measure it at some later time? Do you have an opinion on that? Yeah, I think maybe this is the H.J. case, but I think the case law tells us that we need to look at it during the time of the predicate acts themselves. So this is a mistake Judge Friedman made. He took the facts and looked at them in hindsight and tried to form an opinion about whether or not there was a threat of continuing activity by looking in hindsight after it was all over. And I think both the H.J. case and the Heinrich case tell us that you can't do that. You've got to look at it at the period of time when the predicate acts are occurred. So here, what point in time are you saying we should look at, we should assess a threat? I would say from the period. While you're putting money in the escrow or something? Certainly between the period from January of 2009 when they come to us with this deal and start making representations through 2011 when we have the last set of communications trying to facilitate the furtherance of the scam. But what is it about it from the beginning that makes it continuous and open-ended? I mean, it's a month-to-month deal. Am I right about that? No. In fact, there is no termination date in the contract. Okay. Well, that can be true with a month-to-month deal, right? I mean, it obviously was not going on forever. Well, it could have. I mean, it was essentially an evergreen contract with a 60-day right of termination. Right. So the point I'm getting at is does this mean every time you've got a month-to-month deal with a 60-day termination period, you've crossed the line after a couple months? How does this work in terms of open-ended? You've taken on the easy part, which is we know you're not allowed to look at this after the fact and say, well, aha, it wasn't open-ended because they stopped. We get that. I get it. That's a good point. But how do you look at it from the beginning? Because it doesn't seem to me right that every month-to-month with a 60-day termination window is a RICO scheme. You've got the right open-ended continuity. Right. I think it's a good question, and I think it's why we do have to look at the totality of the circumstances and exactly what was happening here, not only with respect to COLLIDA but with respect to Arrow Air. Is there a case that makes me not have to worry about totality of circumstances? All of the cases. I get your first point. What I'm trying to figure out is how you write an opinion that doesn't say, oh, well, if it's month-to-month, we're off to the races. Because this does look fundamentally like a breach-of-contract case. Right. And not all breach-of-contract cases are RICO cases. No, certainly not. That takes me to a question that I had. Go ahead. But first, maybe an answer to Zev Sutton's question, and then I'll ask my question. I think that going back to the H.J. case again, what the court tells us to do, and the court gave a really good example of this, and I think that it addresses this month-to-month issue. So the court in H.J. gives an example of open-ended continuity in the time period that you look at, and basically the court said, take the example if you have a hoodlum insurance salesman, and the hoodlum insurance salesman goes around to shopkeepers and sells them insurance on a month-to-month basis. The month premium is the money taken from the shopkeepers for the alleged coverage for window breakage. And as it turns out, there's really no insurance coverage, but as long as the hoodlum insurance agent goes around month-to-month collecting the monthly premiums, they continue on with the scam, and that might be a very short period of time, but what it does is evidence a threat of continuing activity, this continuing activity in the future, because until the scam is over, until they run out of money or they get caught for whatever reason, even over a period of just a few months, and I think the court uses that term, you can, this is a good example of an open-ended continuity issue that would be a RICO violation. Judge Rosenthal's got a question. Two points. The 19 number was actually the number of wire transfers out of the escrow account. Out of the escrow. Not into the escrow account, so I wanted to correct that. Yeah. More to Judge Sutton's question and the point at which this changes from breach of contract to RICO in an open-ended issue. The answer that you just gave said nothing about victims. One of the questions that I had about considering the victims in this case is the fact that one of them has nothing to do with jet fuel, does have vaguely to do with escrow accounts, but it's mortgage fraud, basically, and the other one is a jet fuel conspiracy, if you will, scheme, more precisely, but in the lawsuit that grew out of that scheme, they only brought a breach of contract case. The Arrow case. The Arrow case. They did not plead RICO. They didn't even plead fraud. Right. They didn't. It was breach of contract, and to what extent would a judge looking at the motion to dismiss properly take into account all of the information that you now want to argue through the briefing about that case, number one, and number two, what would be the requirement for you, representing Kalita, to put into your complaint in this case the 9B satisfying allegations of what you assert was another victim of the same RICO-based fraud that you assert happened to you? Well, I mean, I think notably with the Arrow victim, that was a bankruptcy case. You know, we don't have any control over what the lawyers decide to allege in their complaint. The law is the law. I think with respect to the interplay between breach of contract and fraud cases, particularly with RICO, every case that the court has had before it that has dealt with RICO has ultimately been a contractual arrangement between two parties or more than two parties. The Waiting Angels, Heinrich versus Waiting Angels case. You know, I have an agreement with you that I'm going to adopt a baby. That is fundamentally a contract dispute at its nature. But there are things that take cases out from the realm of contract into the world of fraud, and that's what we have here. And the allegations that satisfy the 9B issue deal most tangibly, I think, with the bank comfort letter and the phony Atlantic Bank. So GSB comes to my client and says, makes representations that were false. We have the backing of the Atlantic Bank, which is a legitimate bank, and we have $500 million worth of credit for the purpose of facilitating jet fuel sales. We know that was false. We know it was made for the purpose of making my client rely on those false representations. My client did rely on them. So now we're past the point of contract, and now we're into fraud. And we have pled, it is my opinion, that we have pled the elements with specificity necessary to show all of the elements of fraud both under RICO and under the common law fraud. But that's really the crux of it. I mean, that's kind of what takes it out of just a breach of contract and brings it into the world of RICO and the world of fraud when you're saying you're a bank and you're really not. Do you have any more questions? All right. Thank you, Ms. Jackson. We appreciate your argument. We can comfortably say you've out-argued the other side today. I was hoping it would work out that way. We appreciate you being here. Thank you for the brief and oral argument, and the case will be submitted. Thank you very much.